**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| P. C., ET AL. | : | |
|     Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 07-cv-01055(JCH) |
| v. | : | |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| CHILDREN AND FAMILIES, ET AL. | : | JULY 24, 2009 |
|     Defendants. | : | |

**RULING RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 51)**

**I.      INTRODUCTION**

Plaintiffs P.C., S.R.C., and their minor children Pa.C., J.C., and A.C. ("the C. children"), bring this civil rights action against the Connecticut Department of Children and Families ("DCF") and six DCF employees (collectively, "defendants"). Defendant Susan I. Hamilton, DCF Commissioner, is sued in her official capacity only; the remaining DCF employees are sued in their individual and official capacities. P.C., S.R.C., and their children are Connecticut residents. DCF is the Connecticut state agency responsible for the welfare of children and families. This suit concerns DCF's removal of the C. children from their parents' custody in July 2005.

Plaintiffs assert nine causes of action. Counts One through Five, Seven, Eight, and Nine allege that defendants violated 42 U.S.C. § 1983 by depriving plaintiffs of rights guaranteed to them by Connecticut law and the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution. Count Six alleges a state law claim for intentional infliction of emotional distress. Defendants have moved for summary judgment on all counts. For the following reasons, defendants' Motion is granted.

## II.   STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

III.    **BACKGROUND**[1]

A.    Events Surrounding DCF's July 2005 Removal of the C. Children

S.R.C. is an attorney who practices law in Connecticut.  See Defendants' Local

Rule 56(a)(1) Statement ("L.R. 56(a)(1) Stmt.") at ¶ 3.  P.C. and S.R.C. are married and

have three daughters: twins J.C. and Pa.C. (b.1992), and A.C. (b.1995).  See id. at ¶ 1.

In February 2005, DCF initiated a child welfare investigation concerning the C.

children after a school counselor reported to DCF that Pa.C. claimed an adolescent

cousin (referred to herein as "Q.B.") had inappropriately touched her.[2]  See id. at ¶ 2.

DCF social worker Rosemary Furmanek conducted the child welfare investigation on

behalf of DCF and prepared a report of her investigation.  See id. at ¶¶ 6, 7.  The report

states that, during interviews with Furmanek, both J.C. and Pa.C. recounted being

sexually abused by Q.B.  See February 2005 Investigation Protocol ("Investigation

Protocol"), Attachment to Exh. A to Mem. in Supp., at 8-9.  Pa.C. reported, inter alia,

that Q.B. had fondled her and attempted vaginal penetration.  See id. at 8.  J.C.

reported, inter alia, that Q.B. had attempted anal penetration and forced her to perform

oral sex.  See id. at 9.  A.C. did not report any abuse.  See id. at 9.

According to the February 2005 Investigation Protocol, J.C. had not told her

---

[1] For the purposes of the instant motion, the court accepts facts undisputed by the parties and supported by evidence as true, and resolves disputed facts in favor of the nonmoving parties where there is evidence to support their allegations.

[2] Q.B. is the son of U.H., a client of attorney S.R.C.  See L.R. 56(a)(1) Stmt. at ¶ 3.  He was fourteen years old at the time of the events at issue in this case.  See Application for Arrest Warrant, attachment to Exh. M to Defendants' Memorandum in Support of Motion for Summary Judgment ("Mem. in Supp."), at 4.  It is unclear from the record before the court whether Q.B. is related by blood to the C. family.  See Deposition testimony of S.R.C. ("S.R.C. Deposition"), Exh. D to Mem. in Supp., at 37-38.  It is undisputed, however, that the C. family considered Q.B. a cousin and U.H. an uncle, and therefore the court uses the family's terms.

mother of the abuse because she feared her mother would "go crazy."  See id.  At the time of the report, Pa.C. had only recently told her mother of the abuse and had no worries that Q.B. would return to the C. family home.  See id.  The children's mother, S.R.C., told Furmanek that Q.B. was no longer be allowed in the C. home.  See L.R. 56(a)(1) Stmt. at ¶ 17.  DCF substantiated medical neglect against P.C. and S.R.C based on Furmanek's report, but the department took no action in juvenile court.[3]  See Affidavit of Bonnie Resnick, ("Resnick Affidavit"), Exh. 17 to Mem. in Opp., at ¶ 5.

On April 18, 2005, ongoing treatment social worker Outhone Ford was assigned to the C. family case.  See id. at ¶ 18.  S.R.C. told Ford, as she had told Furmanek, that Q.B. was no longer allowed in the family's home.  See id.

Throughout April, May, and June 2005, Ford completed a number of announced and unannounced home visits with the C. family.  See Exh. 5 to Plaintiffs' Memorandum in Opposition of Summary Judgment ("Mem. in Opp.") at 26-34.  In her notes relating to these visits, Ford never recorded seeing Q.B. at the C. home, never recorded seeing any evidence that Q.B. had recently been at the C. home, and never recorded any concern that the C. children were in any danger from Q.B.  See id.  In fact, in one of the few notes mentioning Q.B. that Ford made during this period, she wrote on April 27, 2005, that "[t]he girls stated that the [sic] feel more comfortable with [Q.B.] not being in the home."  See id. at 28.

---

[3] While the precise reasons for the substantiation of medical neglect against P.C. and S.R.C. in February 2005 are unclear, it is undisputed that, after the sexual abuse came to light, S.R.C. did not think a medical exam of her daughters was necessary because the children had not reported any penetration and had not shown any symptoms of a sexually transmitted disease.  See L.R. 56(a)(1) Stmt. at ¶ 13. There is also evidence in the record that, at the time of the February 2005 investigation, J.C. and Pa.C. had not had physicals since 2000, Pa.C.'s immunizations were not up to date, and A.C. was morbidly obese.  See Investigation Protocol at 12, 13.

In May 2005, Pa.C. and J.C. began Sexual Abuse Crisis Services ("SACS") counseling with YWCA counselor Donette Barnette.  See S.R.C. Deposition at 63. According to Ford's notes, both Pa.C. and J.C. reported that they liked attending counseling at the YWCA and J.C. said that she felt like she could talk to the counselor and the counselor would not "tell what she said."  See Exh. 5 to Mem. in Opp. at 34.

As a sexual abuse counselor, Barnette is a "mandated reporter" under Connecticut law.  Conn. Gen. Stat. § 17a-101(b).  A mandated reporter who has reasonable cause to suspect that a child has been abused or neglected is required to make a report to DCF.  See Conn. Gen. Stat. § 17a-101a.  DCF maintains a telephone hotline to receive such reports.  See Conn. Gen. Stat. § 17a-103a.

On July 1, 2005, S.R.C. took Pa.C. and J.C. to a counseling session with Barnette.  See L.R. 56(a)(1) Stmt. at ¶ 25.  S.R.C. was not physically present in the counseling session and thus has no firsthand knowledge of the conversation between her daughters and Barnette.  See id.  Following the counseling session, on July 1, 2005, Barnette made a telephone report to the DCF hotline.  See id. at ¶ 22.  The report, recorded by DCF intake worker Elaine Strinie, states: "Caller is providing counseling to J.C. and Pa.C. following a sexual assault by their cousin [Q.B.]  The girls reported today to the caller that the mother is allowing their cousin to visit the home and he is reportedly still trying to touch the girls."  Id.  The report also notes that, "Caller said J.C. has told the mother that the abuse is still happening and she has told them to move forward."  Id.

Also on July 1, 2005, Barnette filed written reports of suspected child abuse or neglect concerning J.C. and Pa.C.  See id. at ¶¶ 23, 24.  The report concerning J.C.

states, in relevant part:

> In [the July 1, 2005 session] I asked [J.C.] if she still had contact with [Q.B.]
> She said yes that he still comes over.  She said that her mother developed
> 'ground rules:' not to go into the girls room after they had taken a shower, not
> to touch them.  I asked her if [Q.B.] obeys the new rules.  She said, "No, he
> doesn't listen to anyone."  I asked her if her mother knew this.  She said yes
> . . . .

Id. at ¶ 23.  Barnette's report on Pa.C. states, in relevant part: "[Pa.C.] was unable to

recall the last time she saw her cousin (what months?).  She also said that her mother

told her not to tell anyone their business.  To keep it in the family."  Id. at ¶ 24.

In response to the reports from Barnette, on July 1, 2005, DCF invoked a 96-

hour hold, which authorized the Department to administratively remove the C. children

from their parents' custody pursuant to Conn. Gen. Stat. § 17a-101g(e).[4]  See id. at ¶

27; see also Affidavit of Tammi Cuyler ("Cuyler Affidavit"), Exh. H to Mem. in Supp., at 3

("In determining that the 96-hour hold and motions for order of temporary custody were

warranted, I also relied on information from sexual assault crisis counselor Danette [sic]

Barnette").  DCF did not interview any member of the C. family between receiving

Barnette's report and moving for orders of temporary custody.  See id. at ¶ 54.

On July 1, 2005, officers from the Hartford Police Department escorted DCF

employees to the C. home to remove the children.  See id. at ¶ 29.  During the

children's removal, S.R.C. was arrested for interfering with an officer.  See id.  On July

---

[4] Conn. Gen. Stat. § 17a-101g(e) states, in relevant part: "If the Commissioner of Children and
Families, or the commissioner's designee, has probable cause to believe that the child or any other child
in the household is in imminent risk of physical harm from the child's surroundings and that immediate
removal from such surroundings is necessary to ensure the child's safety, the commissioner, or the
commissioner's designee, shall authorize any employee of the department or any law enforcement officer
to remove the child and any other child similarly situated from such surroundings without the consent of
the child's parent or guardian."

5, 2005, DCF filed neglect petitions relating to the C. children, and a Superior Court judge issued ex parte orders of temporary custody.  See id. at ¶ 31.

On July 15, 2005, at the request of DCF, the Superior Court ordered that the C. children participate in a forensic interview at the Aetna Foundation Children's Center at St. Francis Hospital (the "Children's Center").  See id. at ¶ 32.  Subsequently, both J.C. and Pa.C. participated in forensic interviews at the Children's Center.  See id. at ¶ 33. The Children's Center issued a report, dated July 20, 2005, concerning J.C.'s forensic interview, which noted that J.C. had reported being sexually abused by Q.B. from December 2004 until "about April [2005]."  Id. at ¶ 34.

On August 2, 2005, the Superior Court held a hearing on the orders of temporary custody.  See id. at ¶ 36.  On August 8, 2005, the court vacated those orders, thereby returning the C. children to their parents' custody.  See id.  Some months later, DCF moved to withdraw the neglect petitions concerning the C. children.  See id. at ¶ 37.  On January 12, 2006, the Superior Court granted DCF's motion and withdrew the neglect petitions, thereby ending the juvenile court case concerning the C. family.  See id.

Q.B. was eventually charged with, and convicted of, sexually abusing Pa.C. and J.C.  See id. at ¶ 39.

B.    The Defendants

Defendant DCF is the state agency tasked with ensuring the welfare of Connecticut's children and families.  Defendant Susan I. Hamilton, sued in her official capacity only, is the Commissioner of DCF.  See State of Connecticut, Department of Children and Families Website, http://www.ct.gov/dcf/site/default.asp, attached as

Appendix A.

Defendant Loida Reyes has been employed by DCF for approximately 16 years. L.R. 56(a)(1) Stmt. at ¶ 45.  Reyes was not involved in the decision to invoke a 96-hour hold of the C. children or in the decision to seek an order of temporary custody of the C. children.  See id.  She had no involvement in the investigation of the C. family's case, the removal of the C. children, or the decisions related to the litigation pertaining to the C. family in juvenile court.  See id.

Defendant Tammi Cuyler has been employed by DCF for approximately 19 years.  See id. at ¶ 46.  From May 2005 until February 2006, Cuyler held the position of Program Supervisor in an ongoing treatment services unit in DCF's Hartford Office. See id.  During that time period, she had oversight of the C. family case.  See id.

Defendant Bonnie Resnick is a social work supervisor in DCF's Hartford Office. See Resnick Affidavit at ¶ 1.  She has been employed by DCF since 1987.  See id. at ¶ 2.  Resnick supervised two investigations of the C. family, the first in February 2005 and the second in July 2005.  See id. at ¶¶ 3, 4, 10.  During the first investigation, Resnick did not personally gather facts or interview sources.  See id. at ¶ 4.  During the second investigation, Resnick spoke with YWCA counselor Donnette Barnette by telephone to confirm Barnette's report concerning possible abuse of J.C. and Pa.C., and participated in a meeting with other DCF employees in which the participants agreed that there was sufficient information to warrant removal of the C. children.  See id. at ¶ 11.

Defendant Outhone Ford was the social worker assigned to the C. family case. See L.R. 56(a)(1) Stmt. at ¶ 47.  Ford removed the children from the C. family home on July 1, 2005, and submitted an affidavit in support of DCF's motions for orders of

temporary custody of the C. children.  See id. at ¶ 61.

Defendant Kareem Muhammed has been employed by DCF for approximately ten years.  See id. at ¶ 57.  On July 1, 2005, Muhammed was assigned to the C. family case.  See id.  Prior to that date, Muhammed had no involvement with the C. family. See id.  Muhammed accompanied Ford in removing the C. children from their parent's custody on July 1, 2005.  See id. at ¶ 58.  Subsequent to the children's removal, Muhammed had no involvement in the decision to file a motion for temporary custody, the decision to file a neglect petition, or any other decisions related to the court cases involving DCF and the C. family.  See id. at ¶ 59.

**IV.    DISCUSSION**

In their Joint Second Amended Corrected Complaint ("Second Amended Complaint") (Doc. No. 65), P.C. and S.R.C. bring seven causes of action against the defendants and the C. children bring two.  See Second Amended Complaint at 25-40. Six of the seven counts brought by P.C. and S.R.C. are claims pursuant to 42 U.S.C. § 1983 for the alleged violation of P.C. and S.R.C.'s rights under the Constitution and Connecticut law.  The seventh claim alleges intentional infliction of emotional distress under Connecticut common law.  The C. children's two claims are section 1983 actions alleging violations of the children's Constitutional rights and rights under Connecticut law.

A.  Section 1983 Claims

Together, plaintiffs bring eight causes of action pursuant to 42 U.S.C. § 1983. In order to prevail on their section 1983 claims, plaintiffs must prove: (1) that the conduct in question deprived them of a right, privilege, or immunity secured by the

Constitution or the laws of the United States; and (2) that the acts were attributable at least in part to a person acting under color of state law.  See, e.g., Rendell-Baker v. Kohn, 457 U.S. 830, 834 (1982).  There is no dispute that the defendants in this case were acting under color of state law, and therefore the court need only address the first element of plaintiffs' section 1983 claims.  Yet, even if the court were to determine that the conduct at issue in this case violated plaintiffs' rights, such determination would not end the court's inquiry.  The defendants sued in their individual capacities may still be entitled to summary judgment under the doctrine of qualified immunity.

       "The qualified immunity doctrine protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively unreasonable." Tenenbaum v. Williams, 193 F.3d 581, 596 (2d Cir. 1999) (citation omitted).  Such officials enjoy qualified immunity when they perform discretionary functions if either: "(1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that their acts did not violate these clearly established rights." Id. Thus, qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." Lee v. Sandberg, 136 F.3d 94, 100-101 (2d Cir. 1997) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

       Before turning to the plaintiffs' specific section 1983 claims, the court must address three preliminary matters.  First, plaintiffs bring their section 1983 claims against all defendants, including DCF, an agency of the State of Connecticut.  It is clearly established that the Eleventh Amendment bars section 1983 claims against state agencies. See Quern v. Jordan, 440 U.S. 332 (1979) (holding that section 1983

-10-

claims against states are not permitted absent the state's consent); <u>Pennhurst State</u>
<u>Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984) (holding that a suit against a state
agency or department constitutes a suit against a state for Eleventh Amendment
purposes).  Further, Section 1983 provides a cause of action against a "person" who
violates another's federally protected rights while acting under color of state law.  42
U.S.C. § 1983.  A state agency is not a "person" within the meaning of section 1983.
<u>See</u> <u>Will v. Michigan Dep't. of State Police</u>, 491 U.S. 58, 71(1989). Consequently, DCF
is entitled to summary judgment on all of plaintiffs' section 1983 claims.

   Second, it bears noting that, to prevail under a section 1983 claim for damages,
a plaintiff must demonstrate a defendant's direct or personal involvement in the actions
that are alleged to have caused the deprivation of rights.  <u>See</u> <u>Johnson v. Newburgh</u>
<u>Enlarged Sch. Dist.</u>, 239 F.3d 246, 254 (2d Cir. 2001) ("It is well settled in this Circuit
that personal involvement of defendants in alleged constitutional deprivations is a
prerequisite to an award of damages under § 1983").  Personal involvement of a
supervisory official may be established by evidence that:

> (1) the official participated directly in the alleged constitutional violation, (2)
> the official, after being informed of the violation through a report or appeal,
> failed to remedy the wrong, (3) the official created a policy or custom under
> which unconstitutional practices occurred, or allowed the continuance of
> such a policy or custom, (4) the official was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the official exhibited
> deliberate indifference to the rights of others by failing to act on information
> indicating that unconstitutional acts were occurring.

<u>Id.</u> at 254 (quotation omitted).

   In this case, plaintiffs have failed to bring forth evidence upon which a
reasonable jury could find that defendants Hamilton or Reyes were personally involved

in the actions that are alleged to have deprived the plaintiffs of their rights.

With respect to Reyes, plaintiffs admitted in their Local Rule 56(a)(2) Statement that Reyes "was not involved in the decision to invoke a 96-hour hold or to seek an order of temporary custody of the [C.] children," and that Reyes "had no involvement in the investigation, the removal of the children, or in [the] decisions related to the litigation in juvenile court."  See L.R. 56(a)1 Stmt. at ¶ 45; L.R. 56(a)(2) Stmt. at ¶ 45.  Further, there is nothing in the record which suggests that Reyes' personal involvement can be established through any of the other means set forth in Johnson, 239 F.3d at 254.  As a result, Reyes is entitled to summary judgment on all of plaintiffs' section 1983 claims.

With respect to Hamilton, there is no mention of Hamilton in plaintiffs' pleadings or briefings other than the fact that Hamilton is the current Commissioner of DCF.  Because plaintiffs offer no evidence which would establish Hamilton's personal involvement in the actions that are alleged to have caused the deprivation of rights at issue in this case, Hamilton is entitled to summary judgment on plaintiffs' section 1983 claims for damages.  An official cannot be held liable merely because he or she occupies a high position in a government agency hierarchy.[5]  See Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995).

Third, plaintiffs seek declaratory and injunctive relief in the form of: (1) a

---

[5] Although plaintiffs allege generally that defendant DCF failed to train and supervise its employees, they do not specifically allege that either Reyes or Hamilton were deficient in this regard.  See Second Amended Complaint at 31 ("DCF . . . has failed to properly train its employees not to violate the due process and civil rights of the plaintiffs").  Further, even if plaintiffs had alleged that Reyes or Hamilton failed to train or supervise other DCF employees, Reyes and Hamilton would still be entitled to summary judgment on the section 1983 damages claims.  Plaintiffs have not produced evidence sufficient for a rational finder of fact to conclude that any failure train or supervise on the part of either Reyes or Hamilton was the cause of plaintiffs' alleged injuries.

declaratory judgment that the acts and practices of the defendants violated the law; (2) an order requiring the State of Connecticut to discipline the individuals who allegedly discriminated against the plaintiffs; (3) an order enjoining the defendants from continuing the acts and practices at issue in this suit; and (4) an order requiring the State of Connecticut to expunge DCF records relating to the plaintiffs.  See Complaint at 41.

The Eleventh Amendment does not preclude suits against State officers in their official capacity seeking prospective injunctive relief.  See Ex parte Young, 209 U.S. 123, 155-56 (1908); see also Green v. Mansour, 474 U.S. 64, 68 (1985).  Under Ex parte Young, acts of State officers that violate federal constitutional rights are deemed not to be acts of the State and may be the subject of injunctive or declaratory relief in federal court.  See Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985).  Whether a plaintiff's claim falls under the Ex parte Young exception to the Eleventh Amendment's bar against suing a State is a "straightforward inquiry" that asks "'whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997)).

To the extent plaintiffs seek a declaratory judgment that defendants' past conduct violated the law and an order requiring that defendants be disciplined for their past conduct, the relief sought is clearly not prospective and therefore such claims must be dismissed.  See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (the Eleventh Amendment "does not permit judgments

against state officers declaring that they violated federal law in the past"); see also Posr v. City of New York, 835 F. Supp. 120, 123 (S.D.N.Y. 1993), aff'd, 22 F.3d 1092 (2d Cir. 1994) (plaintiff who claimed he was wrongfully beaten, arrested, and jailed did not have standing to seek imposition of discipline on two police officers).  To the extent they seek an order enjoining the defendants from continuing the acts and practices at issue in this suit and an order requiring the State of Connecticut to expunge DCF records relating to the plaintiffs, such claims fail because, inter alia, plaintiffs have not alleged facts sufficient to sustain injunctive relief.

"To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006) (quotation omitted).  In this case, plaintiffs have not alleged that they will be irreparably harmed in the absence of an order enjoining the defendants from continuing the acts and practices at issue in this suit and requiring Connecticut to expunge the plaintiffs' DCF records, nor have they presented evidence sufficient for a rational finder of fact to find that such irreparable harm would occur.[6]  As a result, defendants are entitled to summary judgment on plaintiffs' claims for declaratory and injunctive relief.

      1.  Due Process Claims

In Counts Two, Three, Four, and Five, P.C. and S.R.C. assert section 1983

---

[6] With regard to the defendants' actions, for the reasons discussed herein, see infra at 15-19, the court finds that such actions were not unreasonable.  With regard to the expungement of DCF records, as the defendants point out, such records are confidential.  Conn. Gen. Stat. § 17a-101k(a).  Further, because the substantiations of abuse or neglect against P.C. and S.R.C. were reversed, see Exh. L to Mem. in Supp., the DCF records at issue are sealed and will be expunged five years from the completion of the investigation, see Conn. Gen. Stat. § 17a-101k(h).

claims for the defendants' alleged violation of their right to due process as guaranteed by the Fifth and Fourteenth Amendments.[7]  In Count Nine, the C. children likewise assert a section 1983 claim predicated on the Due Process Clauses of the Fifth and Fourteenth Amendments.

The Fifth Amendment to the Constitution provides, in relevant part, that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V.  The Fifth Amendment applies to and restricts only the federal government.  See Public Utilities Comm'n v. Pollak, 343 U.S. 451, 461 (1952). Because plaintiffs bring no claim against any entity of the federal government, the court analyzes plaintiffs' due process claims under the Fourteenth Amendment only.

a. Counts Two, Five, and Nine

In Count Two, P.C. and S.R.C. allege that defendants denied them due process of law when they "failed to investigate allegations of abuse and neglect as required under state statute."  See Second Amended Complaint at 27.  In Count Five, P.C. and S.R.C. allege that defendants violated their due process rights by "presenting false and misleading information about [them] to the court and other finders of fact."  Id. at 31.  In Count Nine, the C. children bring the same claim.  See Second Amended Complaint at 36.  The plaintiffs base these claims on (1) defendants' allegedly unreasonable reliance on Barnette's July 1, 2005 report; and (2) defendants' allegedly unreasonable decision

_____

[7] It bears noting that the section heading for Count Five in the Second Amended Complaint also mentions the Fourth Amendment.  See Second Amended Complaint at 31 ("COUNT 5: The Civil rights and The 4th, 5th, and 14th U.S. Constitutional Rights of the Plaintiffs Were Violated, When the Defendants Presented False And Misleading Information About the Plaintiffs To The Court And Other Finders Of Fact").  As noted, however, P.C. and S.R.C.'s Fourth Amendment claim fails as a matter of law.  See supra at 15-16.  Accordingly, the court analyzes Count Five as alleging only a violation of the plaintiffs' due process rights.

to remove the C. children based solely on the Barnette report, without further investigation.

Specifically, P.C. and S.R.C. allege that, "state laws and regulations which guide the removal of children under exigent circumstances requires [sic] the workers to perform certain actions prior to removal," including investigating the situation and evaluating it on the basis of DCF regulations.  Second Amended Complaint at 27-28 (emphasis in the original); see also Regs., Conn. State Agencies § 17a-101-13 ("Prior to the immediate removal of a child the authorized Department of Children and Families employee shall . . . investigate the situation and evaluate it on the basis of regulation 17a-101-12").  They further allege that defendants failed to undertake an investigation of the C. children's situation between receiving Barnette's report and invoking the 96-hour hold, thereby violating DCF regulations and violating P.C. and S.R.C.'s due process rights.  Defendants, on the other hand, argue that, even if defendants' actions violated DCF regulations, defendants are entitled to qualified immunity because it was objectively reasonable for defendants to believe that their acts did not violate the Constitution or the laws of the United States.  The court agrees.

It cannot be disputed that plaintiffs have some Constitutional due process rights protecting them against arbitrary state action interfering with their parental custody. See Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir. 1977).  These Constitutional rights were clearly established at the time the C. children were removed from their parent's custody in July 2005.  See id.  However, it was also well established in July 2005 that, "officials may temporarily deprive a parent of custody in emergency circumstances without parental consent or a prior court order."  Robison v. Via, 821

F.2d 913, 921 (2d Cir. 1987) (internal quotation omitted).  Thus, in this case, whether

defendants are entitled to qualified immunity turns on the reasonableness of their belief

that a sufficient emergency existed to warrant taking the C. children into temporary

custody.

This case bears resemblance to the facts facing the court in Doe v. Connecticut

Dep't of Children & Youth Services, 712 F. Supp. 277 (D. Conn. 1989), aff'd, 911 F.2d

868 (2d Cir. 1990).  In Doe, the plaintiff family brought a section 1983 action against the

Connecticut Department of Child and Youth Services and a number of its employees

alleging that the defendants violated the plaintiffs' Constitutional rights when they

temporarily removed a minor child from his parents' custody.  See id.  The record

indicated that the defendants effected the removal after a psychologist treating the child

reported that the child spoke of ongoing sexual abuse at the hands of an older relative,

and gave the psychologist reason to believe that the child's parents knew of the abuse

but failed to stop it.[8]  See id. at 285-287.  Other than contacting the reporting

psychologist and the local police, the defendants made no other investigation of the

psychologist's report before enacting a 96-hour hold and removing the child.

The plaintiffs in Doe claimed, inter alia, that the defendants should not have

inferred a risk of immediate danger from the psychologist's report, but rather should

have undertaken further investigation.  The court rejected this argument, holding that,

based solely on the facts known to the defendants and on which they acted, "a rational

---

[8] One major distinction between Doe and the present case, however, is that, in Doe, the
psychologist treating the child indicated that the child's parents not only failed to stop the abuse, but may
have been direct participants in that abuse.  In the present case, there is absolutely no indication that
either P.C. or S.R.C. ever sexually abused their children, nor do defendants claim as much.

jury could not find [that] it was objectively unreasonable for defendants to believe that [the minor child] was the object of ongoing sexual abuse, or that his removal was necessary to protect him from immediate physical danger." Id. at 285.  In reaching this decision, the court noted that, "[w]hile it was not absolutely established that there was ongoing abuse, there was a reasonable basis to believe that there was ongoing abuse . . . ," and therefore, "[f]urther investigation could result in delay during which the . . . abuse could have continued." Id. at 285-286.  The court also noted that, "[w]hile plaintiffs suggest defendants should have gone further [in investigating the psychologist's report], that is exactly the hindsight which would deter an honest official from acting." Id. at 286.  "Such a finding," the court reasoned, "would inhibit a comparable official, in the same circumstances, and cause him/her to refrain from acting to protect a child who is at risk.  Such inhibition is not in the interest of the community." Id.

In the present case, a rational jury could not conclude that it was objectively unreasonable for the defendants to believe that the removal of the C. children was necessary to protect them from immediate physical danger.  At the time defendants acted, it was undisputed that Q.B. had previously sexually molested J.C. and Pa.C. at the C. home.  While defendants had had no indication prior to July 1, 2005, that Q.B. had returned to the C. home since the abuse came to light, they also had no reason to suspect that Barnette's report was false.  In hindsight, plaintiffs may be correct that Q.B. had not returned to the home and that there was no ongoing abuse, but those are not the pertinent questions in this case.  As the Doe court held, "[t]he possibility that there was no abuse must give way to protection of the child where a reasonable basis exists

for the belief that such protection is necessary."  Id.  In other words, "[w]hen a child's safety is threatened, that is justification enough for action first and hearing afterward."  Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987) (quoting Lossman v. Pekarske, 707 F.2d 288, 291 (7th Cir. 1983)).

For the foregoing reasons, it was objectively reasonable for defendants to believe that there existed an emergency situation, and that they were not violating plaintiffs' Constitutional rights when they effectuated the removal of the C. children from their parents' custody.  Accordingly, defendants are entitled to qualified immunity and, as a result, are entitled to summary judgment on the due process claims set forth in Counts Two, Five, and Nine.

b.  Count Three

In Count Three, P.C. and S.R.C. bring a section 1983 claim against DCF.  See Second Amended Complaint at 29.  As the court has previously noted, see p.10-11, supra, however, the Eleventh Amendment bars section 1983 claims against state agencies.  Therefore, as a matter of law, DCF is entitled to summary judgment on Count Three.  However, even were the court to construe Count Three as a claim against the defendant employees rather than the agency itself, defendants would still be entitled to summary judgment.

Read broadly, Count Three could be construed as P.C. and S.R.C. alleging that the individual defendants violated their due process rights when the defendants placed

P.C. and S.R.C.'s names on the DCF Central Registry[9] without providing them notice of

such listing within five business days as required by state statute.[10]  <u>See</u> Conn. Gen.

Stat. § 17a-101k(b).  However, to the extent P.C. and S.R.C. claim that notice from

DCF came late, such claim would, at most, amount to a claim of simple negligence

rather than a Constitutional due process violation.  In this case, however, plaintiffs'

allegation is not even sufficient to state a claim for negligence.  The five-day notice

requirement was added to Conn. Gen. Stat. § 17a-101k by Public Act No. 05-207, and

became effective on October 1, 2005.  <u>See</u> 2005 Ct. P.A. 207.  DCF substantiated

neglect against P.C. and S.R.C. in February/March 2005 and in August 2005, well

before the five-day notice requirement took effect.[11]  Consequently, defendants are

---

[9] "If the commissioner determines that abuse or neglect has occurred, the commissioner shall also determine whether: (1) There is an identifiable person responsible for such abuse or neglect; and (2) such identifiable person poses a risk to the health, safety or well-being of children and should be recommended by the commissioner for placement on the child abuse and neglect registry established pursuant to section 17a-101k."  Conn. Gen. Stat. § 17a-101g.  Section 17a-101k provides that, "[t]he Commissioner of [DCF] shall maintain a registry of the Commissioner's findings of abuse or neglect of children . . . ."

[10] In the Second Amended Complaint, P.C. and S.R.C. allege that "no notice [of the plaintiffs' inclusion in the registry] was ever given to the plaintiffs by DCF."  Second Amended Complaint at 30, ¶ 5.  In their Memorandum in Opposition to Summary Judgment, however, P.C. and S.R.C. retreat from this claim and instead argue that notice was not given in compliance with state statute.  <u>See</u> Mem. in Opp. at 6-7.

[11] Curiously, in the Second Amended Complaint, P.C. and S.R.C. also claim they were not given notice of listing following a 2001 substantiation of abuse against P.C., which appears to be unrelated to the 2005 removal at issue in this case.  <u>See</u> Second Amended Complaint at 29-30.  They do not claim that any of the defendants in this case were responsible for the placement of P.C.'s name on the registry in 2001, nor have they presented any evidence from which the court could draw such a conclusion.  To the extent Count Three can be read as asserting a section 1983 claim for the 2001 registry listing against DCF – the only defendant who, to the court's knowledge, played any role in the 2001 listing – such claim is barred by the Eleventh Amendment and the plain language of section 1983.  <u>See</u> <u>supra</u> at 10-11.  Further, such claim is barred by Connecticut's three-year statute of limitations.  <u>See</u> Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of"); <u>see also</u> <u>Lounsbury v. Jeffries</u>, 25 F.3d 131, 133 (2d Cir. 1994) (stating that actions brought under section 1983 must "borrow" the "most appropriate or most analogous" state statute of limitations).

entitled to summary judgment on Count Three.

c.  Count Four

In Count Four of the Second Amended Complaint, P.C. and S.R.C. claim that defendants denied them due process when defendants "knowingly usurped a court of competent jurisdiction's order."  Second Amended Complaint at 30.  This allegation is based on the fact that, despite the Superior Court's August 8, 2005 Order vacating the orders of temporary custody, DCF continued to pursue neglect petitions against P.C. and S.R.C.  Defendants argue that they are entitled to summary judgment on Count Four because the Superior Court's August 8, 2005 decision vacating the orders of temporary custody was in no way dispositive of the related neglect petitions.  The court agrees.

To prevail on an order of temporary custody, DCF must establish, by a fair preponderance of the evidence, that the child is in immediate risk of physical harm. See Conn. Gen. Stat. § 46b-129.  By contrast, in order to prevail on a neglect petition, DCF must establish, by a fair preponderance of the evidence, that the child "(A) has been abandoned, or (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth, or (D) has been abused."  Conn. Gen. Stat. § 46b-120.  Thus, the court's finding that DCF had not shown that the C. children were in immediate risk of physical harm did not preclude the Department from pursuing neglect petitions.  The standards for the two actions are distinct.  Consequently, DCF's pursuance of the neglect petitions did not, in any way, "usurp" the Order of the Superior Court.  Because there exists no genuine issue of

material fact as to whether defendants denied P.C. and S.R.C. due process of law by "usurping" a court order, defendants are entitled to summary judgment on Count Four.

        2.  Fourth Amendment Claims

           a.  Count One

In Count One of the Second Amended Complaint, P.C. and S.R.C. allege that defendants violated their right under the Fourth Amendment to be free from "unreasonable searches and seizures.  <u>See</u> Second Amended Complaint at 25. Despite this language, however, P.C. and S.R.C. do not allege in Count One of the Second Amended Complaint that the defendants effected a search.  Rather, Count One appears to be based solely on the defendants' alleged seizure of the C. children.

The law in the Second Circuit is that the state's assumption of custody of a minor child is a seizure under the Fourth Amendment.  <u>See</u> <u>Tenenbaum v. Williams</u>, 862 F. Supp. 962, 973 (E.D.N.Y. 1994), <u>aff'd</u> in part and <u>vacated</u> in part, 193 F.3d 581 (2d Cir. 1999) (citing <u>Van Emrik v. Chemung County Dep't of Social Services</u>, 911 F.2d 863, 867 (2d Cir. 1990)).  The seizure of the C. children, then, implicates the children's Fourth Amendment rights.

The seizure of the C. children does not, however, implicate the Fourth Amendment rights of P.C. and S.R.C. as alleged in Count One.  <u>See</u> Second Amended Complaint at 25 ("The specific acts of the DCF employees . . . violated <u>the rights of the parents</u> in this manner . . . ") (emphasis added).  That is, to the extent they bring a claim to redress their own Fourth Amendment rights, as opposed to the Fourth Amendment rights of their children, such claim fails as a matter of law.  <u>See</u> <u>Tenenbaum v. Williams</u>, 862 F. Supp. 962, 974 (E.D.N.Y. 1994), <u>aff'd</u> in part and <u>vacated</u> in part, 193 F.3d 581

(2d Cir. 1999) ("[T]he court is not aware . . . of any federal decision which has held that a parent may legitimately assert an individual, as distinct from representative, Fourth Amendment claim based upon the seizure of a child"); see also F.K. v. Iowa Dist. Court, 630 N.W.2d 801, 806 (Iowa 2001) ("Numerous federal courts have recognized parents' rights under 42 U.S.C. § 1983 to vindicate – in a representative capacity – the constitutional interests of their children whose removal from their custody was accomplished without warrant . . . .   These cases uniformly recognize that the seized children, not their parents, have privacy interests protected by the Fourth Amendment"). Neither P.C. nor S.R.C. has been the subject of a search or seizure at the hands of the defendants.  Consequently, defendants are entitled to summary judgment as to Count One.

### b.  Count Nine

In Count Nine, the C. children assert a section 1983 claim for defendants' alleged violation of their Fourth Amendment right to be free from unreasonable searches and seizures.[12]  "The Fourth Amendment protects 'the people' from 'unreasonable searches and seizures,' also providing that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons of things to be seized."  Tenenbaum v. Williams, 193 F.3d 581, 602 (2d Cir. 1999) (emphasis and alterations in the original).  The analysis of the C. children's Fourth Amendment claim results in a test similar, for the present purposes, to the due

---

[12] The section heading for Count Nine mentions the Fourth Amendment, in addition to the Fifth and Fourteenth Amendments.  The paragraphs supporting Count Nine, however, contain only allegations of violations of the C. children's due process rights, rather than their Fourth Amendment rights. Nevertheless, the court analyzes Count Nine as stating both Fourth Amendment and due process claims.

process standard.  See id. at 604 ("If the information possessed by [caseworkers] would have warranted a person of reasonable caution in the belief that [a child] was subject to the danger of abuse if not removed from [her parent's custody] before court authorization could reasonably have been obtained, her removal was reasonable also"). In the context of a child removal, "a court order is the equivalent of a warrant."  Id. at 602.  Further, "probable cause" is "descriptive of what seizures are 'reasonable' when . . . no warrant has been obtained."  Id. at 602-03.

In this case, because defendants have invoked qualified immunity, the court need not determine whether there was, in fact, probable cause to seize the C. children without court authorization, but rather whether defendants were reasonable in their belief that probable cause existed to support such a seizure.  See Orlik v. Dutchess County, 603 F. Supp. 2d 632, 648 (S.D.N.Y. 2009).  For the reasons stated in the due process analysis above, see supra at 15-19, while the clarity of hindsight may have revealed that the C. children were not in danger on July 1, 2005, this does not make defendants' belief on that date unreasonable.  As previously noted, defendants relied on an undisputed history of abuse and information from an independent, mandated reporter in reaching the determination that to leave the C. children in their parents' custody until a court order for their removal could be obtained would pose a risk to the children's health and safety.  At the very least, caseworkers of reasonable competence could disagree on the reasonableness, and therefore the legality, of defendants' actions.  As a result, defendants are entitled to qualified immunity and thus summary

judgment on the C. children's Fourth Amendment claim.[13]  See Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir. 1999).

### 3.  Equal Protection Claims

In Count Seven, P.C. and S.R.C. allege that defendants violated section 1983 by denying them equal protection of the laws.  In Count Eight, the C. children bring the same claim.

Plaintiffs' claims in Counts Seven and Eight are premised on the allegation that, after the C. children were removed from their parent's custody, the defendants denied the plaintiffs equal protection of the laws by failing to follow certain DCF regulations governing the children's removal, placement, and return.[14]  See Second Amended Complaint at 33-36.  Specifically, plaintiffs allege that defendants did not comply with DCF regulations found at Regs. Conn. State Agencies § 17a-101-13(c) and (d) by, inter alia, failing to conduct proper placement planning, separating A.C. from her sisters, and placing the twins in a Spanish-speaking home when they speak only English.[15]  Even if

_____

[13] It bears noting that, in reaching this decision, the court recognizes the Second Circuit's emphasis on "the importance of the availability of qualified immunity where child welfare workers are seeking to protect children from abuse."  Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir. 1999).

[14] Plaintiffs originally asserted in Counts Seven and Eight that Barnette and the YWCA violated Conn. Gen. Stat. § 52-146(k).  All claims against Barnette and the YWCA were dismissed by stipulation on April 9, 2009.  See Order re Stipulation of Dismissal (Doc. No. 97).

[15] Regs. Conn. State Agencies § 17a-101-13(c) states, in relevant part: "Procedures on removal. If the Commissioner of [DCF] or his designee authorizes the employee to remove the child without the consent of the child's parent or guardian and the employee determines that immediate removal is required, the employee shall (1) notify the parent(s) . . . of the determination and the reason for it within 24 hours; (2) cooperate with and accompany the designated law enforcement officer authorized to remove the child, or request the local law enforcement officials to accompany the employee if necessary; (3) Placement Planning for the child shall give consideration to (A) relatives who are reliable caretakers; (B) licensed foster home; (C) state-owned shelter care facilities or licensed, contracted child-caring facilities; (D) hospital-if required; (4) make every attempt to place siblings together and maintain family ties."
Regs. Conn. State Agencies § 17a-101-13(d) states, in relevant part: "Procedures during the 96-hour hold.  Upon removal, the employee shall within 96 hours either: (1) return the child to his parent(s)

the court were to find that defendants ignored DCF regulations, however, without more, such a finding would be insufficient to sustain a section 1983 action based on the Fourteenth Amendment's Equal Protection Clause.

As previously noted, the defendants are entitled to qualified immunity unless the plaintiffs' allegations, if true, establish that their conduct violated a clearly established constitutional right.  See, e.g., Woodlock v. Orange Ulster B.O.C.E.S., 281 Fed. Appx. 66 (2d Cir. 2008) ("The threshold inquiry is whether a plaintiff's allegations, if true, establish a constitutional violation.  If they do not, there is no necessity for further inquiries concerning qualified immunity").  In Counts Seven and Eight, plaintiffs allege that defendants violated various DCF regulations.  Such allegations, however, are not the same as alleging that a clearly established constitutional right has been violated.

As the Supreme Court has stated, "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."  Davis v. Scherer, 468 U.S. 183, 194 (1984). "Rather, these officials become liable for damages only to the extent that there is a clear violation of the . . . rights that give rise to the cause of action for damages [under section 1983]." Id.  In other words, a constitutional violation must be established separately from the issue of a state statutory violation.  See Bush v. Viterna, 795 F.2d 1203, 1209 (5th Cir. 1986) ("[T]he enforcement of state law is the job of the states, and [section 1983] may not be used to bootstrap alleged violations of state law into federal claims").

---

. . . ; or (2) assist the parent(s) . . . in voluntarily placing the child in some other mutually acceptable living arrangement; or (3) if the parent(s) . . . refuses to place the child voluntarily, petition the Superior court-Juvenile Matters for commitment of the child and an order of temporary custody."

In this case, plaintiffs have failed to make out a cognizable violation of their rights under the Fourteenth Amendment's Equal Protection Clause.  The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike.  See Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  Construing Counts Seven and Eight broadly, the court reads plaintiffs' claims as asserting a violation of the Equal Protection Clause through selective enforcement of the law.  A selective enforcement claim generally has two elements: (1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.  See LaTrieste Restaurant & Cabaret v. Village of Port Chester, 40 F.3d 587, 590 (2d Cir.1994).  However, a plaintiff not alleging invidious discrimination on the basis of membership in some group may nevertheless prevail on an equal protection claim if she shows: (1) she has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in treatment.  See Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

In this case, plaintiffs do not allege in their Second Amended Complaint that defendants' failure to comply with various DCF regulations was unique to their case, nor that such failure was the result of defendants' intentionally treating them differently from others similarly situated.  Even if they had so alleged, they have not presented sufficient evidence for a rational finder of fact to find that: (1) any selective treatment was based on impermissible considerations; or (2) defendants intentionally treated plaintiffs

differently from others similarly situated without a rational basis for such difference in treatment.  Thus, because there exists no genuine issue of material fact requiring trial on plaintiffs equal protection claims, defendants are entitled to summary judgment on Counts Seven and Eight.

        B.    <u>State Law Claim</u>

In Count Six, P.C. and S.R.C. allege that defendants are liable for intentional infliction of emotional distress ("IIED").  Defendants argue that they are entitled to summary judgment on P.C. and S.R.C.'s IIED claim because P.C. and S.R.C. have not presented sufficient evidence to establish a prima facie case of IIED.  The court agrees.

Under Connecticut law, to succeed on an IIED claim, a plaintiff must show that: (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was severe. <u>See</u> <u>Carrol v. Allstate Ins. Co.</u>, 262 Conn. 433, 443 (Conn. 2003).  "The essential element of the claim is whether the alleged conduct is considered 'extreme and outrageous' according to the standards of a civilized community."  <u>Lavoie v. United States</u>, 2009 U.S. Dist. LEXIS 37622 (D. Conn. May 4, 2009).  "Whether defendants' conduct was sufficiently 'extreme and outrageous' is initially a question for the court to decide."  <u>Id.</u> (quoting <u>Crocco v. Advance Stores Co.</u>, 421 F. Supp. 2d 485, 503 (D. Conn. 2006)).

"Federal courts in the District of Connecticut, applying Connecticut law, have interpreted the qualification of extreme and outrageous conduct strictly."  <u>Lavoie v.</u>

United States, 2009 U.S. Dist. LEXIS 37622 (D. Conn. May 4, 2009) (quotation

omitted).  "[O]nly where the conduct has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded

as atrocious, and utterly intolerable in a civilized community" will the second prong of

the case for intentional infliction of emotional distress be satisfied.  Carrol, 262 Conn. at

443.  "Generally, the case is one in which the recitation of the facts to an average

member of the community would arouse his resentment against the actor, and lead him

to exclaim, 'Outrageous!'"  Id.  "Conduct on the part of the defendant that is merely

insulting or displays bad manners or results in hurt feelings is insufficient to form the

basis for an action based upon intentional infliction of emotional distress."  Id.

        In this case, the court finds that defendants' conduct does not rise to the level of

extremity and outrage necessary to sustain an IIED claim.  DCF is the state agency

responsible for ensuring the welfare of Connecticut's children.  DCF social workers are

tasked with investigating suspected child abuse or neglect and deciding whether to take

action to protect the safety and welfare of the children in question.  In this case, it is

undisputed that, if the facts reported to DCF by Barnette were accurate, those facts

would provide sufficient basis for removing the C. children from their parents' custody,

especially in light of the undisputed history of abuse by Q.B.  See L.R. 56(a)(1) Stmt. at

¶ 40.  The essence of plaintiffs' claim, then, is that defendants wrongly relied on

Barnette's report.  Even if defendants did err in relying on Barnette's report, however,

such error does not amount to conduct that is "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded

as atrocious, and utterly intolerable in a civilized community."  Carrol v. Allstate Ins. Co.,

262 Conn. 433, 443 (Conn. 2003).

Barnette, a professional sexual abuse counselor, was in an ongoing counseling relationship with Pa.C. and J.C..  As a mandated reporter, Barnette was required by Connecticut law to report to DCF if she had reasonable cause to suspect that the girls had been abused or neglected.  See Conn. Gen. Stat. § 17a-101a.  The record contains no indication that defendants believed Barnette's report was inaccurate or incomplete, nor does it contain any evidence from which the court can conclude that defendants should have suspected that Barnette's report was inaccurate or incomplete. As a result, defendants' removal of the C. children based on Barnette's report was not "extreme and outrageous," Carrol, 262 Conn. at 443, and defendants are entitled to summary judgment on Count Six.

**V.      CONCLUSION**

For the foregoing reasons, defendants' Motion for Summary Judgment (Doc. No. 51) is **GRANTED** as to all counts.  The Clerk is directed to enter judgment and close this case.

**SO ORDERED**.

Dated at Bridgeport, Connecticut, this 24th day of July, 2009.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge


-30-

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| P. C., ET AL. | : | |
|     Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 07-cv-01055(JCH) |
| v. | : | |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| CHILDREN AND FAMILIES, ET AL. | : | JULY 24, 2009 |
|     Defendants. | : | |

## APPENDIX A TO RULING RE:
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 51)



# DEPARTMENT
## OF
## CHILDREN AND FAMILIES



STATE OF CONNECTICUT

ABOUT US    PROGRAMS AND SERVICES    PUBLICATIONS    FORMS    CONTACT US    HOME

**DCF Search:**



Advanced Search

>> EMPLOYMENT SERVICES

>> PROFESSIONALS

>> FAMILIES

>> CHILDREN & YOUTH

**Adopt a Child**



**DCF Directions and Phone Numbers**

**Department of Children and Families**
505 Hudson Street
Hartford, CT 06106

**Ombudsman's Office**
860-550-6301
or toll-free
866-637-4737



**E-ALERTS**
Receive DCF news updates by e-mail.
>> Subscribe now or update your e-Alerts

>> LOGIN

---

New **Weekly High Five**    Monday
Tuesday
Wednesday
Thursday
Friday

Follow the hand below to find useful information every Monday-Friday concerning children and their families through the "Weekly High Five" link. Each week there will be a new theme with topics geared to the well-being of Connecticut children and their families

**Summer is here! How to have a good, safe and fun summer!**

Today's Topic:    When you're near the water, make sure there's a grown-up (or, better yet) a lifeguard always watching you and your "buddy"!

Find additional Useful Family Information at CTParenting.com

---

**Agency Mission    Diversity & Inclusion**

**Preventing Infant Abandonment**



**Heart Gallery Index of Children**

Become A Foster Or Adoptive Parent

Call 1-888-KID-HERO



Stories Of Connecticut Children And Families

**Report Abuse And Neglect**
**HOTLINE 1-800-842-2288**

Ways to Help Children    Parent Guide To DCF Acronyms

Guidelines for Leaving Your Child Alone

## Latest News

### July 2, 2009



On June 20, 2009 a Basketball clinic/game was held for adolescent youth in DCF care from the Meriden office.

### June 11, 2009
Partnership Between DCF and Judicial Branch Credited For Reducing Number Of Youths Involved With Delinquency, The CT Post Reports.

### May 27, 2009
The Bristol Press reports that a local couple credits the state

---



**Susan I. Hamilton**
**Commissioner**

Welcome message from the Commissioner

**CT Keyword:**

 

**Featured Links**





Conferences & Events

Policy and Regulations

Positive Outcomes For Children (POC)

Links to Related Sites

Update 2009 OPM-Approved Re-procurement Plan

Youth Gambling video

---

7/14/2009 3:34 PM

Department of Children and Families' Adoption Unit for helping them find the children and get the help they needed to make it work.

May 13, 2009
Photos of the Heart Gallery opening held at the Imagine Nation Museum, One Pleasant Street, Bristol, CT 06010, (860) 314-1400.  Heart Gallery Exhibit runs until June 30, 2009.  Photo's provided by the Hartford Courant.

May 13, 2009
Photos of the Foster Care Concert in Blue Back Square, West Hartford, provided by the Hartford Courant.

 May 10, 2009
Safe Haven Baby Makes For A Special Mother's Day,  The Hartford Courant Reports.

April 21, 2009
Two families brought the "Safe Havens" babies they adopted to Saint Francis Hospital to show the real impact the law has on the lives of children and their families. News coverage of the press conference can be accessed on the links below.

Governor's Safe Haven Press Release

WFSB-TV(CBS) Channel 3
WVIT-TV(NBC) Channel 30
WTIC-TV(FOX) Channel 61
WTIC-AM(CBS) Frequency 1080

Please utilize the Click for QuickView button to view above videos or audio

 April 2, 2009
Finally, A Collaborative Program That Really Helps Desperate Parents Reports Helen Ubinas from the Hartford Courant

For additional stories about this topic see March 20, 2009 below.

 March 25, 2009
Youths In Foster Care Say Why They Want To Follow Their Social Worker's Footsteps At Ceremony For National Social Work Month

March 20, 2009
DCF Teams With Judicial Branch And DMHAS To Offers New Drug Treatment Program, CT Media Reports

The Connecticut Post

The New Britain Herald